IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

REBECCA J. CAMMON,

        Plaintiff,

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

CIVIL ACTION FILE NO.

3:08-CV-0131-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied her applications for a period of disability and disability insurance benefits. For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **REVERSED** and that the case be **REMANDED** for further proceedings.

## I.    Procedural History

Plaintiff Rebecca J. Cammon protectively filed applications for a period of disability and disability insurance benefits on May 26, 2004. The claimant alleged she

became disabled on July 30, 2002, due to back disorders and organic mental disorders. [Record ("R.") at 13, 42, 70-82]. After her applications were denied initially and on reconsideration, an administrative hearing was held on July 10, 2008. [R. at 13, 29-59, 289-316]. The Administrative Law Judge ("ALJ") issued a decision on July 30, 2008, denying the claimant's applications. [R. at 13-26]. Plaintiff requested review by the Appeals Council, but Plaintiff's request was denied on September 12, 2008. [R. at 5-9]. As a result, the decision of the ALJ stands as the final decision of the Commissioner, making it subject to judicial review. Plaintiff filed her complaint for judicial review [Doc. 3] in this court on November 20, 2008, and the parties have consented to proceed before the undersigned Magistrate Judge.

## II.    Statement of Facts

The ALJ found that claimant Rebecca Cammon has degenerative disc disease, hypertension, depression, anxiety disorder, somatoform disorder, and borderline intellectual functioning. [R. at 20]. Although these impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 21]. The ALJ found that the claimant has the residual functional capacity to perform a

significant range of sedentary work with a number of limitations. [R. at 22]. The ALJ found that Plaintiff could not perform her past relevant work, but she concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could have performed through December 31, 2007, the date last insured. [R. at 25]. Accordingly, Plaintiff was not under a disability from her alleged onset date through the date last insured. [R. at 26]. The ALJ's decision [R. at 13-26] states the relevant facts of this case as modified herein as follows:

At the time of the hearing, the claimant's age was 41. She had been married since she was 16 years old, having dropped out of school in the ninth grade to get married. She currently lives with her husband and 16-year-old daughter in a house. She is not working at the present time. She testified that she has not driven for the past three or four years, since she has been on medication. The claimant testified that while in school, she was in special education classes. She has never had any job training. She can read small words, and she can write. She explained that she was assisted by her brother-in-law in completing the Social Security forms.

The claimant last worked operating a machine doing production work. Her job involved making socks and required her to lift a bag of socks weighing almost as much as a gallon of milk. She did this work standing. The claimant worked for the same

AO 72A
(Rev.8/8
2)

employer at this job for almost fourteen years. She also testified that she previously worked at a cleaning/vacuum dusting industrial plant for a while. She testified that she worked for a nursing home for two weeks when she was 14 years old and still in school. She does not remember when she left the factory job. She testified that, while on that job, her back started hurting. The claimant first discussed it with her boss, and then she went to see her doctor. She recalls being told she had arthritis. She also recalls being told she would be out of work for a week. Soon thereafter she was laid off. In her Daily Living Questionnaire from 2004 (Exhibit 5E), she wrote that, after her return to work, she was unable to meet production because of missed days and the need to get up from her work station. She never received worker's compensation for any work-related injury.

Currently, the claimant alleges neck and shoulder pain, stiffness, weakness and leg tremors. She testified that her legs are weak and jump at night. She also testified that she had a "seizure" three or four months ago. She stated that she was getting "stressed" one day and lost consciousness. When she came to, an ambulance was there. The claimant testified that the next morning she went to the hospital and was admitted. She stated that she was told her sodium level had dropped and that this

4

AO 72A

(Rev.8/8

2)

condition could lead to death. She stated that she never found out what caused the seizure.

The claimant testified that she is treated by Dr. Davis. She stated that he gives her medication for depression, nerves, her heart, high blood pressure, and to control seizures. She also is prescribed medication by Dr. Lee. Specifically, she takes Lortab for her back pain. Other than obtaining prescription pain medication, the claimant does not receive any other treatment for her back or see any other health care provider for the condition. At the hearing, the claimant found it difficult to describe the side effects of her medications. She did state that the medication for her back pain makes her feel sleepy and that she sometimes forgets things.

The claimant testified that she spends most of her day lying down on the couch or bed due to the constant pain. She described the pain as similar to a toothache in the lower part of her back. She stated that it gets worse if she rides in the car too long or moves around too much. She said that medication helps reduce the pain. She uses BenGay and a heat pad which provides some relief. She also stated that she will occasionally have her daughter hit her on her back.

The claimant testified that she can lift only about five pounds. She can walk 15 minutes, and then she is tired and weak and ready to lie down. When she starts to hurt,

AO 72A
(Rev.8/8
2)

she will have to rest for 20 minutes.  She stated that she cannot stand for long periods of time.  She stated that she cannot bend because it feels like something grabs and catches.  She also alleged that she cannot bend at the knees.  She does not have problems using her hands.

The claimant's typical day consists of taking a shower and lying around the house.  Her daughter helps her in and out of the shower.  She stated that she cannot stand long enough to cook a meal.  The household chores are done by her daughter and her husband.  She stated that she has problems sleeping at night but stated that this condition is better since she has been on the medication that Dr. Lee gave her.  She no longer does the grocery shopping.  The claimant stated that she is a nervous and shy person, although she does get along with people.  Nevertheless, she testified to engaging in no social activities.  She stated that she does not have any problem concentrating but that, currently, she cannot tell what is on television as she does not pay attention.

A Function Report completed by the claimant's husband, Jack Cammon, describes similar daily activities, as well as physical restrictions.  (Exhibit 4E).  He wrote that he tries to encourage his wife to work to increase her stamina.  Significantly,

AO 72A

(Rev.8/8

2)

he notes that the claimant has been unable to "get a quality job" due in part to her physical condition but also due to her inability to read and write.

On May 31, 2002, the claimant underwent thoracic spinal x-ray studies to evaluate her spine after a fall. These studies revealed only minimal end plate degenerative changes. (Exhibit 17F, p.10). The claimant continued to have back pain and sought further treatment.

From September 5, 2002, through October 17, 2002, the claimant was seen for evaluation and treatment of back pain by Gregory Slappey, M.D. Dr. Slappey noted the claimant had lumbar disc degeneration that was not responding to conservative treatment and that he was going to keep her out of work until September 20, 2002. On October 17, 2002, Dr. Slappey reported that a recent MRI of the claimant was normal. He noted that his neurological examination findings were grossly normal, that the claimant had good range of motion, and that there was no soft tissue swelling and no loss of lordosis. His diagnosis was of lumbar degenerative disc disease and cervical strain. He noted that he thought it was important to get the claimant back to work and keep her there on a light-duty basis. He hoped to eventually get her back to full duty. (Exhibit 18F).

AO 72A

(Rev.8/8

2)

On August 16, 2004, the claimant was seen by Linda Cunanan, M.D., for a medical evaluation. At the time, the claimant's complaints were of low back pain. Dr. Cunanan notes in her report that the claimant admitted that she worked until the plant shut down about one year prior. Dr. Cunanan's physical examination showed the claimant to be well developed and well nourished. All physical findings were within normal limitations. Lumbar spine x-ray study revealed narrowing of the joint space between L4-L5 and was otherwise unremarkable. Her examination led Dr. Cunanan to the impression that the claimant had chronic low back pain, probably due to degenerative joint disease of the lumbosacral spine; possible degenerative joint disease of the cervical spine; probably essential hypertension; and hyperventilation. Dr. Cunanan noted, "She can see, hear, and speak well without any difficulty. She can grasp, finger, and feel without difficulty. Pushing and pulling may be difficult because of low back pain. Pushing and pulling of the upper extremities are not difficult and not impaired. There are no focal neurological signs present, and I doubt the diagnosis of herniated discs. She had no intolerance to environmental factors such as heat, humidity, fumes, chemicals, dust, rain, or cold. She has no mental problems. I think this patient magnifies her symptoms." (Exhibit 2F).

AO 72A
(Rev.8/8
2)

On August 24, 2004, the claimant was seen by Dick Maierhofer, Ph.D., for a psychological evaluation. When asked about her current health she said, "It's okay except for my back, neck, and left leg." Dr. Maierhofer's report reveals that the claimant reported that she has never had any counseling or mental health treatment. The claimant was not taking any psychotropic medication at the time. When asked how she was doing mentally, she said, "Okay, I guess." Weschler Adult Intelligence Scale - Third Edition ("WAIS-III") testing performed by Dr. Maierhofer found a verbal scale IQ score of 63, a performance scale IQ score of 75, and a full scale IQ score of 61. Wide Range Achievement Test-3 ("WRAT-3") testing found a reading standard score of below 45, a spelling standard score of 47, and an arithmetic standard score of 52. Dr. Maierhofer noted, "The testing was not suggestive of organic dysfunctioning, but she was seen as a slow learner with a limited education." Dr. Maierhofer noted that the claimant would be able to follow work rules and that her judgment skills were seen as adequate. He noted that she would be able to interact adequately with other workers and supervisors and be able to understand basic job instructions. Her emotional stability was seen as fair. Dr. Maierhofer's diagnosis was of adjustment disorder with mixed anxiety and depressed mood. Dr. Maierhofer noted

AO 72A
(Rev.8/8
2)

that the claimant had weak cognitive skills but adequate adaptive behaviors. (Exhibit 5F).

On August 25, 2004, George Cross, M.D., a State agency consultant, upon reviewing the medical evidence of record, completed a Physical Residual Functional Capacity Assessment of the claimant. Dr. Cross found the claimant could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds. He found that the claimant could stand and/or walk a total of about six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour work day and was unlimited in the ability to push/pull with the upper or lower extremities, including operation of hand and/or foot controls. He found the claimant could only occasionally climb ladders, ropes, and/or scaffolding; kneel; crouch; and crawl. He found no other postural, manipulative, visual, communicative or environmental limitations. Further, Dr. Cross noted the claimant's allegations of arthritis and degenerative disc disease in her spine were partially credible. (Exhibit 4F).

On September 16, 2004, Cathy Blusiewicz, Ph.D., completed a Psychiatric Review Technique form regarding the claimant's impairment. She found that the claimant had borderline intellectual functioning and adjustment disorder with mixed anxiety and depressed mood. Dr. Blusiewicz also found that the claimant would have

10

mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and that she had never had any episodes of decompensation. (Exhibit 7F).

Dr. Blusiewicz also completed a Mental Residual Functional Capacity Assessment form. She found the claimant would be moderately limited in her ability: to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Blusiewicz noted that these were not substantial limitations or restrictions. (Exhibit 8F).

On February 16, 2005, the claimant was seen by Phil Astin, M.D., for evaluation and treatment of chronic back pain. He noted that she had severe degenerative arthritis. She had no edema but was tender in the lower back. Dr. Astin noted the back pain was controlled with medication. The claimant had previously seen Dr. Astin occasionally from 1995 through 2001 for sinus drainage, a rash on her face, heart burn, and lower back pain. (Exhibit 17F).

AO 72A
(Rev.8/8
2)

On November 9, 2005, Dr. Astin completed a Medical Assessment of Ability to do Work-Related Activities form for the claimant. He found the claimant could lift and/or carry less than 10 pounds; could stand and/or walk no more than a half hour in an eight-hour workday; and could sit for no more than a half hour in an eight-hour workday. He found the claimant could not use her left hand for pushing and/or pulling repetitively and could not use either foot for repetitive movements, such as pushing and/or pulling of leg controls. Dr. Astin noted the claimant had severe back disease with limited activity secondary to chronic pain and had been totally disabled since November 13, 2001. (Exhibit 10F).

On December 1, 2005, the claimant was seen by Charles Hubbard, M.D., for a medical evaluation based upon a complaint of back pain. Dr. Hubbard's report of the claimant's past history revealed that the claimant had no medical problems and was taking no regular medication. Dr. Hubbard noted that the claimant had been a patient in his office for the last several years and had been diagnosed with degenerative disc disease in the lumbar area. A MRI scan taken in 2002 was totally negative. Dr. Hubbard noted, "Nonetheless, she complains of decreased standing, walking and lifting tolerances (sic) because of her back." He noted that she got on and off the examination table without difficulty and walked with a normal gait. He noted that she

12

had full and painless range of motion in all areas with the exception of the lumbar spine which he noted could not be determined due to lack of patient cooperation. He noted that she did not have any atrophy or decrease in reflexes. She had no motor or sensory deficits. X-rays showed only modest narrowing of the L5-S1 disc space. The rest of the examination was unremarkable. Dr. Hubbard noted, "It is clear that the patient was not fully cooperating with examination. I, therefore, see no evidence of permanent impairment." (Exhibit 11F).

On January 31, 2006, the claimant was seen again by Dick Maierhofer, Ph.D., for a consultative evaluation. During the history, the claimant noted she stopped working because "They shut down – then I started having problems with my back." WAIS-III testing found a verbal scale IQ score of 61, a performance scale IQ score of 60, and a full scale IQ score of 58. WRAT-3 testing found a reading standard score of below 45, a spelling standard score of below 45, and an arithmetic standard score of below 45. Dr. Maierhofer noted the scores seemed to be a reflection of her limited background and history of special education and due to her minimal effort. He noted that she could understand directions and that she was able to work without supervision. The quality of her work was fair but the quantity was limited. He noted, "The testing was not suggestive of organic dysfunctioning, but she was seen as a slow learner who

13

put forth only limited effort into the testing." Dr. Maierhofer found that the claimant would be able to follow work rules and that her judgment skills were seen as adequate. He noted she would be able to interact fairly well with other workers and supervisors and be able to understand simple job instructions. Her emotional stability was seen as fair. Dr. Maierhofer's diagnosis was of adjustment disorder with mixed anxiety and depressed mood and undifferentiated somatoform disorder. (Exhibit 12F).

On February 8, 2006, Celine Payne-Gair, Ph.D., completed a Psychiatric Review Technique form regarding the claimant's impairment. She found that the claimant had borderline intellectual functioning, an adjustment disorder with mixed anxiety and depressed mood, and somatoform disorder and that she would have mild restrictions of activities of daily living. The claimant would have mild difficulties in maintaining social functioning; she would have moderate difficulties in maintaining concentration, persistence or pace; and she had never had any episodes of decompensation. (Exhibit 13F). Dr. Payne-Gair also completed a Mental Residual Functional Capacity Assessment form. She found the claimant would be moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a

14

consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. Dr. Payne-Gair noted that these were not substantial limitations. (Exhibit 15F).

On February 8, 2006, John Heard, M.D., a State agency consultant, completed a Case Analysis noting that upon review of the medical evidence of record the claimant complained of low back pain with no physical findings. He noted that, in the medical evidence of record, there was evidence of only slight narrowing of the lumbosacral joint but otherwise a negative neurological examination. He noted that the claimant's treating physician stated that the claimant had no disability. Further, Dr. Heard noted the claimant's impairment was non-severe. (Exhibit 16F).

From September 14, 2007, through April 17, 2008, the claimant was seen by Charles Davis, M.D., six times for evaluation and treatment of depression, hypertension, and back pain. Dr. Davis noted that she appeared well nourished, well developed, alert, and in no apparent distress. She was prescribed Prozac, Lyrica, Klonopin, Lortab, Coreg, and Lisinopril. (Exhibit 20F).

From September 26, 2007, through March 19, 2008, the claimant was seen by Yong Lee, M.D., four times for evaluation and treatment of neck and back pain. Dr. Lee noted that the claimant had been under the care of Dr. Astin on rather high doses

AO 72A

(Rev.8/8

2)

of narcotic analgesics and that Dr. Astin was no longer in practice. Dr. Astin had prescribed OxyContin. After Dr. Astin, the claimant went to Dr. Holloway and then to Dr. Davis. Both of these doctors referred the claimant when her narcotic medication dosage got to a level high enough to cause concern. On March 19, 2008, Dr. Lee noted that he had questioned the claimant in regards to her utilization of narcotic analgesic pain management. She claimed the medication to be effective; she stated that with the medications in place she is able to be a "better homemaker and mom" and that she felt that her medications allowed her improved functionality. During this period, she was prescribed MS Contin, Lortab, and Xanax. (Exhibit 19F).

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III.    Standard of Review

An individual is considered to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically

AO 72A
(Rev.8/8
2)

acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. §§ 423(d)(2) and (3).

The scope of judicial review of the Commissioner's decision is limited. The court's function is to determine: (1) whether the record, as a whole, contains substantial evidence to support the findings and decision of the Commissioner; and (2) whether the Commissioner applied proper legal standards. See Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984). Substantial evidence is more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that she is unable to perform her former type of work. If the claimant satisfies her burden of proving disability with respect to her former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given her age, education, work experience, and impairment, has the capacity to perform other

17

AO 72A
(Rev.8/8
2)

types of jobs which exist in the national economy.  See Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

Under the regulations as promulgated by the Commissioner, a five step sequential procedure must be followed when evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).  In the sequential evaluation, the Commissioner must consider in order: (1) whether the claimant is gainfully employed, 20 C.F.R. §§ 404.1520(b) and 416.920(b); (2) whether the claimant has a severe impairment which significantly limits her ability to perform basic work-related functions, 20 C.F.R. §§ 404.1520(c) and 416.920(c); (3) whether the claimant's impairments meet the Listing of Impairments, 20 C.F.R. §§ 404.1520(d) and 416.920(d); (4) whether the claimant can perform her past relevant work, 20 C.F.R. §§ 404.1520(e) and 416.920(e); and (5) whether the claimant is disabled in light of age, education, and residual functional capacity, 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If, at any step in the sequence, the claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).

## IV.    Findings of the ALJ

The ALJ made the following findings of fact:

AO 72A
(Rev.8/8
2)

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 30, 2002, through her date last insured of December 31, 2007 (20 C.F.R. §§ 404.1520(b) and 404.1571, <u>et seq.</u>).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease; hypertension; depression; anxiety disorder; somatoform disorder; and borderline intellectual functioning (20 C.F.R. § 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. The claimant has the residual functional capacity to perform a significant range of sedentary work as defined in 20 C.F.R. § 404.1567(b) in that she can stand and walk no more than 30 minutes in a day, cannot use foot pedals, must have a sit/stand option every 30 minutes, can occasionally climb, kneel, crouch, crawl, bend and stoop; can understand, remember and perform only simple tasks that are routine and repetitive in nature, cannot understand written instructions, cannot perform tasks requiring production quotas and needs regular supervision (meaning direct contact with supervisor three to five times per day).

6. Through the date last insured, the claimant was unable to perform past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on April 21, 1967, and was 40 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

AO 72A

(Rev.8/8 2)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from July 30, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 C.F.R. § 404.1520(g)).

[R. at 20-26].

## V.  Discussion

In the present case, the ALJ found at the first step of the sequential evaluation that Plaintiff Rebecca Cammon had not engaged in substantial gainful activity from her alleged onset of disability on July 30, 2002, through her date last insured of December 31, 2007. [R. at 20]. At the second step, the ALJ determined that through the date last insured, the claimant had degenerative disc disease, hypertension, depression, anxiety disorder, somatoform disorder, and borderline intellectual functioning. [R. at 20]. Although these impairments were "severe" within the meaning of the Social Security Regulations, the ALJ found at the third step that they did not meet or medically equal, either singly or in combination, one of the listed impairments in 20 C.F.R. Part 404,

AO 72A
(Rev.8/8
2)

Subpart P, Appendix 1. [R. at 21]. The ALJ found at the fourth step of the sequential evaluation that the claimant was unable to perform her past relevant work as a sewing machine operator. [R. at 24]. However, at the fifth step, the ALJ concluded that through the date last insured, she was able to perform jobs which exist in significant numbers in the national economy, such as inserter, assembler, and sorter. [R. at 25]. Therefore, the claimant was not under a disability at any time from July 30, 2002, the alleged onset date, through December 31, 2007, the date last insured. [R. at 26]. Plaintiff Cammon argues that the ALJ committed errors when she found that Plaintiff did not meet Listing 12.05C, when she assessed Plaintiff's mental residual functional capacity, and when the ALJ relied upon testimony of a vocational expert that allegedly conflicted with the Dictionary of Occupational Titles. [Doc. 13].

## A. Listing 12.05C

Plaintiff Cammon contends that she meets the requirements of Medical Listing 12.05C based on her low IQ scores, her deficits in adaptive functioning, and her other physical and mental impairments which affect her ability to perform work-related functions.[1] [Doc. 13 at 11-16]. Listing 12.05 states, in pertinent part, "Mental

---

[1]"In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration

AO 72A
(Rev.8/8
2)

retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05; <u>accord</u> <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997) ("To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."). To meet Listing 12.05C for mental retardation, a claimant must show that she has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05C. The ALJ found that Plaintiff did not have a valid verbal, performance, or full scale IQ of 70 or below and that she "demonstrates no restriction in adaptive functioning prior to the current onset of physical symptoms." [R. at 22]. The first issue the court will address is whether Plaintiff has offered evidence of an IQ score that meets the requirements of Listing 12.05C.

---

requirement." <u>Wilkinson on Behalf of Wilkinson v. Bowen</u>, 847 F.2d 660, 662 (11th Cir. 1987) (emphasis in original) (citing 20 C.F.R. § 416.925).

AO 72A

(Rev.8/8

2)

Plaintiff Cammon underwent a psychological evaluation on August 24, 2004, by Dr. Dick Maierhofer. [R. at 178-84]. WAIS-III testing found a verbal scale IQ score of 63, a performance scale IQ score of 75, and a full scale IQ score of 61. [R. at 182]. Dr. Maierhofer saw Plaintiff again on January 31, 2006, for a consultative evaluation. [R. at 212-17]. At that time, Plaintiff's verbal scale IQ score was found to be 61, her performance scale IQ score was 60, and her full scale IQ score was 58. [R. at 215]. Despite the multiple IQ scores well below 70, the ALJ found that "the claimant does not have . . . a valid verbal, performance, or full scale IQ of 60 through 70. . . ." [R. at 22]. Substantial evidence does not support this finding.

Social Security regulations provide, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.00(D)(6)(c). The lowest IQ score from the 2004 evaluation was 61, and the lowest score from the 2006 evaluation was 58. [R. at 182, 215]. The ALJ made it clear in her decision that she found Plaintiff's IQ scores from both evaluations to be invalid because of findings made by Dr. Maierhofer. The ALJ noted Dr. Maierhofer's statement that the "testing was not suggestive of organic dysfunctioning, but [Plaintiff] was seen as a slow learner

23

who put forth only limited effort into the testing." [R. at 22, 216]. The ALJ wrote, "Dr. Maierhofer declines to specifically find the test scores valid" because he found Plaintiff's "scores seemed to be a reflection of her limited background, history of special education and minimal effort." [R. at 22, 215]. While the ALJ correctly noted that Dr. Maierhofer did not specifically state that the IQ scores were valid, he also did not state that the scores were invalid. [R. at 22].

In both the 2004 and 2006 evaluations, Dr. Maierhofer noted Plaintiff's IQ scores and wrote, "Her scores would place her in the lower end of the mildly retarded intellectual area." [R. at 182, 215]. In the August 2004 evaluation, Dr. Maierhofer wrote that Plaintiff's "scores reflected her limited background and history of special education." [R. at 182]. There is no indication that Dr. Maierhofer found that these factors undermined the accuracy of the IQ scores. Plaintiff correctly notes that a history of special education would actually support the validity of the scores. [Doc. 13 at 12].

In the January 2006 evaluation, Dr. Maierhofer added that Plaintiff's low IQ scores seemed to reflect not only her limited background and history of special education but also her "minimal effort." [R. at 215]. Although not stated explicitly, Dr. Maierhofer may have believed that Plaintiff's minimal effort during the 2006

24

evaluation caused the across-the-board reduction of IQ scores from 2004 to 2006 (verbal scale IQ scores went from 63 to 61, performance scale IQ scores went from 75 to 60, and full scale IQ scores went from 61 to 58). [R. at 182, 215]. One could reasonably conclude, as the ALJ did, that Dr. Maierhofer found the 2006 IQ scores to be invalid based on his statement that the scores reflected Plaintiff's minimal effort. The ALJ, however, went further than this and not only found that Plaintiff's minimal effort during the 2006 evaluation invalidated the IQ scores found at that time, but she also concluded that the IQ scores from the 2004 evaluation were invalid. [R. at 22]. This was improper.

There is nothing in the 2004 evaluation suggesting any doubts about Plaintiff's effort. [R. at 182]. There is also no evidence suggesting that Dr. Maierhofer believed that Plaintiff's minimal effort during the 2006 evaluation invalidated the IQ scores from 2004. [R. at 215]. For this reason, the court finds that substantial evidence does not support the ALJ's decision to invalidate the 2004 verbal and full scale IQ scores of 63 and 61, respectively. Remand, therefore, is necessary in order for the ALJ to reevaluate her finding that "the claimant does not have . . . a valid verbal, performance, or full scale IQ of 60 through 70." [R. at 22].

25

AO 72A

(Rev.8/8 2)

Upon remand, the ALJ should also address whether the evidence presented by Plaintiff, including her IQ scores, created a rebuttable presumption of mental retardation before the age of twenty-two. A valid IQ score of 60 to 70 and evidence of an additional mental or physical impairment creates a rebuttable presumption that the criteria under Listing 12.05C has been met. See Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir. 2001). In Hodges, the court held that because "mental retardation is a condition that remains constant throughout life[,] . . . a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she presented evidence of low IQ test results after the age of twenty-two." Id. at 1266. The rebuttable presumption issue was not addressed by the ALJ in her decision.

As discussed *supra*, Listing 12.05 states that a finding of mental retardation requires "significantly subaverage general intellectual functioning" and "deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05. In addition to discounting Plaintiff's low IQ scores, the ALJ found that Plaintiff "demonstrates no restriction in adaptive functioning prior to the current onset of physical symptoms."

26

AO 72A

(Rev.8/8

2)

[R. at 22]. In support of this finding, the ALJ noted that "Dr. Maierhofer specifically declined to diagnose the claimant as mentally retarded." [R. at 22].

The fact that a claimant has not been diagnosed with mental retardation is probative on the issue of whether the claimant meets Listing 12.05C, but it is not determinative. Although the language of Listing 12.05 closely tracks the diagnostic criteria for mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association 4th ed. 1994) ("DSM-IV"), there are differences between the two. The Social Security Administration has stated that "the diagnostic criteria in the mental disorders listings are not bound by those in the DSM-III-R (or DSM-IV). . . ." 65 Fed. Reg. 50,746, 50,760 (August 21, 2000).

The DSM-IV states that the "essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning. . . ." DSM-IV at 39. The DSM-IV also stipulates that "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." Id. at 40. Thus, a diagnosis of mental retardation under the DSM-IV requires significantly subaverage general intellectual functioning accompanied by significant deficits or limitations in adaptive functioning. Like the DSM-IV, Listing

27

12.05 requires "significantly subaverage general intellectual functioning." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05. However, unlike the DSM-IV, Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be "deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05. In the present case, Dr. Maierhofer stated that Plaintiff had *adequate* adaptive behaviors, which would indicate that Plaintiff did not have *significant* deficits in adaptive functioning as required by the DSM-IV. [R. at 184, 217]. However, the fact that Dr. Maierhofer found Plaintiff's adaptive behaviors to be adequate does not mean that Plaintiff had absolutely *no* deficits in adaptive functioning as found by the ALJ.

The evidence in the record reveals that Plaintiff had at least some deficits in adaptive functioning prior to the age of twenty-two. While in school, Plaintiff was in special education classes. [R. at 15]. Testing revealed that Plaintiff's ability to read and spell is only at the first grade level and that her ability to perform arithmetic is at the third grade level. [R. at 182]. In both the 2004 and 2006 evaluations, Dr. Maierhofer found that Plaintiff's "language and math skills would place her in the illiterate area. . . ." [R. at 183, 216]. There is no evidence that the ALJ considered Plaintiff's illiteracy in finding that she did not meet Listing 12.05C. As Plaintiff notes,

28

in <u>Vaughn v. Astrue</u>, 494 F. Supp. 2d 1269, 1274 (N.D. Ala. 2007), the court found that a claimant with an IQ score of 70 established that she had deficits in adaptive functioning before age twenty-two by offering evidence of a history of special education, a reading ability on the fourth grade level, and an arithmetic ability on the second grade level. Given Plaintiff Cammon's similar history of special education and her lower level of reading ability which Dr. Maierhofer classified as illiteracy, the undersigned concludes that upon remand the ALJ should reevaluate the issue of whether Plaintiff had any "deficits in adaptive functioning initially manifested . . . before age 22" as required by Listing 12.05. 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05.

In summary, the court finds that substantial evidence does not support the ALJ's decision that Plaintiff fails to meet Listing 12.05C. The court, therefore, **ORDERS** that the ALJ's decision be **REVERSED** and that the case be **REMANDED** for further proceedings in accordance with the discussion *supra*.

**B**.    **RFC Assessment and Alleged Conflict Between VE and DOT**

Plaintiff next argues that the ALJ erred when she made the mental residual functional capacity ("RFC") assessment and when she relied upon testimony of a vocational expert ("VE") that allegedly conflicted with the Dictionary of Occupational

AO 72A

(Rev.8/8

2)

Titles ("DOT"). [Doc. 13 at 17-22]. Because the court has concluded that remand is warranted on the issue of whether Plaintiff meets Listing 12.05C, an extensive discussion of these additional issues is not necessary. The court, nevertheless, will briefly address Plaintiff's arguments in order to provide the ALJ with further guidance upon remand.

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. Along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. §§ 404.1545(a) and 404.1520(f)). In determining the claimant's RFC, the ALJ is required to consider the limiting effects of all the claimant's impairments, even those that are not severe. See 20 C.F.R. § 404.1545(e); Phillips v. Barnhart, 357 F.3d 1232, 1238-39 (11th Cir. 2004) ("[T]he ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."). Plaintiff argues that the ALJ based her mental RFC assessment on an incomplete and unsupported assessment of Dr. Maierhofer's findings. [Doc. 13 at 17-19].

AO 72A

(Rev.8/8

2)

The ALJ found that Plaintiff "can understand, remember and perform only simple tasks that are routine and repetitive in nature, cannot understand written instructions, cannot perform tasks requiring production quotas and needs regular supervision (meaning direct contact with supervisor three to five times per day)." [R. at 22]. The ALJ stated that Plaintiff has limitations in her ability "to adapt to stress, such as production quotas," and that Plaintiff's mental RFC was "consistent with and supported by Dr. Maierhofer's reports." [R. at 24]. The ALJ's finding that Plaintiff cannot perform tasks requiring production quotas is consistent with Dr. Maierhofer's finding that Plaintiff is slow in doing tasks. [R. at 184, 217]. However, as Plaintiff notes, while Dr. Maierhofer found that she "would have trouble handling stress on a job," he did not state what caused Plaintiff stress. [R. at 184, 217]. Upon remand, this issue should be addressed. The ALJ should also offer some explanation regarding Plaintiff's somatoform disorder. [R. at 20, 217]. Based on Dr. Maierhofer's diagnosis, the ALJ found this disorder to be a severe impairment which, as Plaintiff notes, means that even the ALJ found that it significantly limited her ability to perform work-related functions. [Doc. 13 at 18-19; R. at 20, 217]. However, there is no indication that

AO 72A
(Rev.8/8
2)

limitations caused by Plaintiff's somatoform disorder were reflected in the RFC assessment.[2]

Plaintiff argues that the ALJ erred when she did not include Plaintiff's education level in the hypothetical question posed to the VE. [Doc. 13 at 21-22]. The ALJ must accurately and comprehensively describe the claimant's impairments when posing a hypothetical. See Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). The ALJ stated in her decision that Plaintiff has a limited education, but this was not included in the hypothetical to the VE. [R. at 24, 312-15]. The regulations define limited education as a level consisting of seventh grade through eleventh grade of formal education. 20 C.F.R. § 404.1564(b)(3). The regulations provide, however, that "the numerical grade level that you completed in school may not represent your actual education abilities." 20 C.F.R. § 404.1564(b). As noted *supra*, test scores showed that Plaintiff has reading, spelling and arithmetic skills in the range of first to third grade level. Dr. Maierhofer found in both the 2004 and 2006 evaluations that Plaintiff's "language and math skills would place her in the illiterate area. . . ." [R. at 183, 216]. Given these facts, it does not appear that the ALJ's finding regarding Plaintiff's

---

[2]Dr. Maierhofer stated that Plaintiff's emotional stability was "fair" in 2004 and "marginal" in 2006. [R. at 184, 217]. Despite Plaintiff's arguments to the contrary, there is no evidence that Dr. Maierhofer intended to show a difference in the findings.

AO 72A
(Rev.8/8
2)

education level was supported by substantial evidence. The Commissioner argues that even if Plaintiff's education level was below the limited level found by the ALJ, Plaintiff could still perform the unskilled jobs cited by the VE and the ALJ. [Doc. 15 at 20]. If Plaintiff's level of education had been the only error committed by the ALJ, the court might be persuaded by the Commissioner's "harmless error" argument. However, because remand is necessary on other grounds, the ALJ should, in accordance with the relevant regulations, reevaluate Plaintiff's education level in a manner consistent with the evidence showing Plaintiff is illiterate.

Plaintiff's final argument is that the ALJ erred when she relied upon testimony of a VE that allegedly conflicted with the DOT. [Doc. 13 at 19-22]. According to Plaintiff, the "VE failed to provide an explanation for how all of the unskilled sedentary jobs he identified permit Cammon to alternate sitting and standing every 30 minutes, so there is no support for finding that Cammon could perform any of the positions identified by the VE." [Doc. 13 at 19-20]. Plaintiff also argues that the VE failed to explain how the hypothetical claimant who was only capable of performing simple tasks could work as a fishing-reel assembler. [Id. at 20]. Finally, Plaintiff contends that, while the ALJ found that she needed regular supervision, the DOT does not address this need and that the VE failed to explain how this can be accomplished

AO 72A

(Rev.8/8

2)

in the specific jobs he claimed Plaintiff could perform. [Id. at 21]. The court finds

these arguments unpersuasive.

> Social Security Ruling 00-4p provides:
>
> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.

SSR 00-4p. Thus, pursuant to Social Security Ruling 00-4p, the ALJ is required to

elicit an explanation from the VE "[w]hen there is an apparent unresolved conflict

between VE . . . evidence and the DOT." In the present case, the court finds that the

ALJ had no reason to believe that there was any conflict between the VE's testimony

and the DOT. The VE testified at the administrative hearing that a person with the

limitations described by the ALJ in the hypothetical would be able to perform jobs

which exist in significant numbers in the national economy, such as inserter,

assembler, and sorter. [R. at 25, 312-15]. The VE relied on the DOT and informed the

ALJ of the DOT codes for each position. [R. at 313-15]. Moreover, the VE explicitly

stated that his testimony was consistent with the DOT. [R. at 315]. Given the fact that

34

AO 72A

(Rev.8/8

2)

an impartial vocational expert[3] stated that his testimony was consistent with the DOT, the court finds that it would not have been apparent to the ALJ that there was any "unresolved conflict between VE . . . evidence and the DOT." SSR 00-4p. Any unresolved conflict also was not apparent to Plaintiff's counsel, as the VE was not questioned about his testimony by counsel. [R. at 315]. The Seventh Circuit has written, "Although the ALJ has a duty to question a VE about any inconsistencies with the DOT and resolve that conflict before relying on the VE's testimony, SSR 00-4p at 4, counsel has the responsibility for raising the issue if the ALJ does not." Buchholtz v. Barnhart, 98 Fed. Appx. 540, 546 (7th Cir. 2004). For these reasons, the court finds that the ALJ did not commit error when she relied on the testimony of the VE.

## VI.    Conclusion

For all the foregoing reasons and cited authority, the court finds that the decision of the ALJ was not supported by substantial evidence. It is, therefore, **ORDERED** that the Commissioner's decision be **REVERSED** and that this action be **REMANDED** for further proceedings in accordance with the above discussion. See Melkonyan v.

---

[3]"A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." Phillips, 357 F.3d at 1240.

35

<u>Sullivan</u>, 501 U.S. 89, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991). The Clerk is **DIRECTED** to enter judgment accordingly.

In the event that benefits are awarded on remand, Plaintiff's attorney may file a motion for approval of attorney's fees under 42 U.S.C. §§ 406(b) and 1383(d)(2) no later than thirty days after the date of the Social Security letter sent to Plaintiff's counsel of record at the conclusion of the Agency's past-due benefit calculation stating the amount withheld for attorney's fees. Defendant's response, if any, shall be filed no later than thirty days after Plaintiff's attorney serves the motion on Defendant. Plaintiff shall file any reply within ten days of service of Defendant's response.

**SO ORDERED**, this 2nd day of October, 2009.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/8

2)